304 Ga. 290
FINAL COPY

S18A0855. McCULLOUGH v. THE STATE.

NAHMIAS, Justice.

Appellant Brawny McCullough was found guilty of malice murder and other crimes in connection with the shooting deaths of his father, Donald Eugene McCullough ("Gene"), and his great-aunt, Peggy Molden. The State sought the death penalty, but the jury decided that Appellant should instead be sentenced to life in prison without parole. In this Court, Appellant contends that the evidence presented at his trial was insufficient to support his convictions and that the trial court abused its discretion and violated his Sixth Amendment right to counsel by denying his request to continue the trial to accommodate a scheduling conflict that one of his lawyers had, even though Appellant had already been granted one lengthy continuance and was represented at trial by three other competent capital defenders. We reject these contentions, but we

vacate the trial court's judgment in part to correct a sentencing error.[1]

1.   (a)   Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. In 2008, while Gene was living in Alabama, a black man attempted to shoot him through the door of his house, but missed. In 2010, Gene was shot twice at the door of his house by a white man. The shooting left Gene paralyzed from the waist down, so he moved to Covington, Georgia to live with his aunt, Molden. Appellant also lived in Georgia and would sometimes visit Gene and Molden.

On February 5, 2012, two days before the murders, Appellant went to a Super Bowl party, where he told a co-worker, Bernard Watts, that he had

[1] The crimes occurred on February 7, 2012. On April 13, 2012, a Newton County grand jury indicted Appellant and Jonathan Henderson for two counts each of malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony. On June 14, 2012, the State gave its notice of intent to seek the death penalty. Appellant was tried alone beginning on February 1, 2016, and at the conclusion of the guilt-innocence phase on February 16, the jury found him guilty of all charges. On February 19, after the sentencing phase of the trial, the jury decided that Appellant should be sentenced to life without parole. The trial court then sentenced him to serve concurrent terms of life in prison without the possibility of parole for the two malice murders, a consecutive term of 20 years for the aggravated assault of Gene, and consecutive terms of five years each for the two firearm counts. The court merged the aggravated assault of Molden and purported to merge the felony murder counts into the malice murder convictions, although the felony murder verdicts were actually vacated by operation of law. See Oliphant v. State, 295 Ga. 597, 601 (759 SE2d 821) (2014). As explained in Division 1 (c) below, the aggravated assault of Gene should have merged into the conviction for murdering him. Appellant filed a timely motion for new trial, which he amended with new counsel on January 31, 2017. After a hearing, the trial court denied the motion on May 22, 2017. Appellant filed a timely notice of appeal, which he amended on June 13, 2017. The case was docketed in this Court for the April 2018 term and submitted for decision on the briefs.

2

arranged for a man to shoot Gene in 2010. Appellant also told Watts that he now planned to pay Jonathan Henderson, a black man who was Watts's cousin and Appellant's friend, $10,000 to kill Gene in order to collect on a $150,000 life insurance policy on Gene that named Appellant as the primary beneficiary. Appellant said that he planned to have Henderson use the same gun that was used to shoot Gene in 2010.

On the morning of February 7, paramedics responded to a Life Alert call from Gene and Molden's house. They found Gene, who had been shot seven times, lying dead between his bed and the wall. Sheriff's officers and GBI investigators then came to the house. They found Molden, who had died from a single gunshot wound to the head, lying on the basement stairs. The investigators found a .38-caliber shell casing in the driveway, a .38 projectile on the floor by the front door, and two more .38 projectiles under Gene's bed.

That evening, the investigators interviewed Appellant as a family member, not a suspect. He said that he and Gene were close, that he had last seen Gene a week ago, and that he had no idea who could have shot Gene and Molden. Later that night, Appellant told his roommate that Appellant was going to receive a large amount of money as the beneficiary of his father's life insurance

policy, and several times during the next week, Appellant asked family members and the investigators about the insurance.

About a week after the murders, Watts contacted the investigators and related what Appellant had told him at the Super Bowl party. The GBI then obtained cell phone records that showed that Appellant and Henderson exchanged numerous calls and text messages in the days leading up to the murders, including nine calls on the day before; their cell phones were turned off on the morning of the murders, and they did not communicate after that. On February 17, Appellant and Henderson were arrested. During a search of Henderson's car, police found a bottle of bleach, a box of latex gloves, a holster in which a .38 revolver would fit, and a copy of Gene's obituary. Appellant and Henderson both admitted involvement in the murders during their interviews with investigators later that day.

In his interview, the videotape of which was played for the jury, Appellant said that he was angry with his father because Gene had always treated him badly. Appellant said that in 2008, after he complained about Gene to Henderson, Henderson shot at Gene but missed. Appellant claimed that Henderson had approached him recently and offered to kill Gene in exchange

4

for money. According to Appellant, he accepted the offer, planned the murders with Henderson, and brought his .38 revolver when he and Henderson drove in Henderson's car to Gene and Molden's house, but he then told Henderson not to go through with their plan. Appellant claimed that Henderson shot Gene and Molden with Appellant's revolver anyway, and when Appellant asked why, Henderson said "it had to go down because we were already here now." Appellant did not testify at trial.

Henderson testified at Appellant's trial under a grant of testimonial immunity and in exchange for the State's withdrawing its intent to seek the death penalty against him.[2] As he had told the investigators, Henderson told the jury that in 2008, 2009, 2010, and late 2011 or early 2012, Appellant asked him to kill Gene for $10,000, but he declined. On the day of the murders, he drove Appellant to Gene's house because Appellant claimed that Gene was sick and Appellant wanted to visit. On the way there, Appellant asked Henderson to turn off his cell phone. After they arrived and exchanged pleasantries with Gene and Molden, Appellant pulled out his revolver and shot Molden and then Gene.

---

[2] The record does not indicate how the charges against Henderson were ultimately resolved.

5

Appellant later warned Henderson not to tell the police about the shootings, and Henderson fled to South Carolina before returning to Georgia.

While they were both in jail, Appellant sent several notes and documents to Henderson. One document was an unsigned affidavit for a person to fill out stating that he or she had witnessed Henderson recant his statement to the investigators. In a note, Appellant included suggestions on how to get a confession suppressed. Appellant also drafted a statement for Henderson to make saying that everything Henderson had told the investigators about Appellant was false.

According to Dustin Huddleston, a white man who was interviewed by the investigators and also testified at trial, Appellant offered him money to kill Gene in 2010; they later went to Gene's house in Alabama, where Appellant shot Gene. Gene's autopsy found three recent and two older bullet fragments in his body. The medical examiner determined that the two older fragments were from the 2010 shooting. A ballistics expert determined that all of the bullet fragments found in Gene's body were fired from the same .38-caliber revolver as the shell casing and projectiles found at the scene of the murders. The revolver was never located.

(b)    Appellant contends that this evidence was legally insufficient to support his convictions.  In particular, he argues that the State presented no physical evidence like fingerprints or DNA linking him to the crimes and that the State's main witness, Henderson, was biased against Appellant because he was granted a deal in exchange for his testimony.  As we have explained many times, however, "'it is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient.'"  Merritt v. State, 292 Ga. 327, 330 (737 SE2d 673) (2013) (citation omitted).  The State is not required to corroborate its witnesses with physical evidence, see Johnson v. State, 296 Ga. 504, 505 (769 SE2d 87) (2015), and how a witness's deal with the State affects his credibility is for the jury to determine, see State v. Vogleson, 275 Ga. 637, 639 (571 SE2d 752) (2002).

When properly viewed in the light most favorable to the jury's verdicts, the State presented ample evidence of Appellant's guilt, including evidence that he had tried to hire other men to kill Gene several times beginning in 2008 and that Gene had been shot at in 2008 and shot and paralyzed in 2010; that Appellant told Watts he planned to have Henderson kill Gene two days before

7

the murders; that Appellant had a significant financial motive to kill Gene; that Appellant and Henderson communicated frequently by phone in the days before the murders but turned off their phones that morning, when they went together to Molden and Gene's house with Appellant's .38-caliber revolver; and that the bullet fragments in Gene's body from the 2010 shooting and the fatal shooting were fired from the same .38 revolver. Moreover, Appellant admitted to planning Gene's murder with Henderson and providing the weapon that was used to kill Gene and Molden (although he tried to blame the actual trigger-pulling on Henderson), and he then sent notes and documents to Henderson in jail in an attempt to persuade Henderson to recant his statement implicating Appellant. Thus, the evidence presented at trial was sufficient to authorize a rational trier of fact to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

(c) We have noticed, however, an obvious merger error that harms Appellant and should be corrected. See Dixon v. State, 302 Ga. 691, 696-697 (808 SE2d 696) (2017). As discussed in footnote 1 above, the jury found Appellant guilty of two counts each of malice murder, felony murder,

8

aggravated assault, and possession of a firearm during the commission of a felony. The trial court sentenced him to serve concurrent terms of life in prison without the possibility of parole for the two malice murders, a consecutive term of 20 years for the aggravated assault of Gene, and consecutive terms of five years each for the two firearm counts. However, the aggravated assault of Gene, which was predicated on the same shooting that caused his death, should have merged into Appellant's conviction for the malice murder of Gene, just as the trial court properly merged the aggravated assault of Molden into the conviction for her murder. See Oliphant v. State, 295 Ga. 597, 601 (759 SE2d 821) (2014). See also Donaldson v. State, 302 Ga. 671, 674-675 (808 SE2d 720) (2017). We therefore vacate Appellant's conviction and sentence for the aggravated assault of Gene (Count Five of the indictment). See Oliphant, 295 Ga. at 602.

2.     Appellant contends that his Sixth Amendment right to counsel was violated when the trial court denied his request for another continuance of his trial to allow him to be represented by one of his lawyers who was scheduled to try another case at the same time. Whether to grant a request for a continuance is a matter within the discretion of the trial court. See OCGA § 17-8-22. We see no abuse of that discretion, and no Sixth Amendment violation, under the

circumstances of this case.

(a)    Shortly after his arrest in February 2012, Appellant asked that counsel be appointed to represent him. On July 10, 2012, after Appellant was indicted and the State gave notice of its intent to seek the death penalty, Brad Gardner, an attorney with the capital defender division of the Georgia Public Defender Council, filed his appearance to represent Appellant. See OCGA § 17-12-12 (a) ("The Georgia capital defender division shall represent all indigent persons charged with a capital felony for which the death penalty is being sought in any court in this state . . . ."). Another capital defender, Teri Thompson, was appointed as co-counsel in November 2014. In December 2014, the court specially set the trial of Appellant's case for August 17, 2015. A couple months before that trial date, Appellant moved for a continuance, explaining that Gardner likely had another trial scheduled for the same time and that he needed more time to prepare for the mitigation portion of Appellant's trial. The trial court denied the motion, noting that this case was the second oldest on Gardner's case list and should take priority over his other case.

On August 7, 2015, however, Appellant filed another continuance motion, explaining that Gardner was on medical leave. At the hearing on the motion on

August 11, co-counsel Thompson assured the trial court that if the court granted the continuance, the director of the capital defender division, Gerald Word, "would place another attorney on [Appellant's] team and the case can be prepared for trial by the first of the year." The court granted the motion, emphasizing that "[Word] needs to have in mind who he's going to appoint" and "we cannot just sit around and wait around until [Gardner] gets healthy." Thompson indicated that she agreed. The court rescheduled the trial for February 1, 2016.

On August 31, 2015, Word entered his own appearance to represent Appellant. In the fall of 2015, Gardner returned to work on Appellant's case, and on December 21, 2015, he filed another conflict notice, which said that he was required by Uniform Superior Court Rule (USCR) 17.1 to try an earlier-filed death penalty case scheduled for the same time as Appellant's trial. The notice did not, however, "certif[y] that the [conflicting] matters cannot be adequately handled, and the client's interest adequately protected, by other counsel for the party in the action or by other attorneys in lead counsel's firm." USCR 17.1 (A) (2). At a motions hearing on January 8, 2016, the trial court addressed the conflict issue with the parties. Word told the court that he would

11

be prepared for trial but that Gardner should be allowed to remain Appellant's lead counsel. Word therefore requested that the court continue Appellant's trial again. Word said that he was not as familiar with the case as Gardner and that trying the case without Gardner would constitute a "de facto change in lead counsel." Word explained that since Gardner had returned from medical leave, Word had focused on "very specific areas of the case" and was planning to serve as third chair at trial, that he had only worked on the case for four months, and that Thompson had served as co-counsel for a little over a year, while Gardner had "been in the case from day one." Word acknowledged, however, that he was qualified to serve as lead counsel and said that, if the continuance were denied, "I promise the court we'll be ready to go [to trial]." When asked by the court, Appellant said that he preferred Gardner to remain his lead counsel, although he gave no specific reason for that preference.

On January 14, 2016, the trial court entered its "Order on Notice of Conflict by Attorney Brad Gardner." The court noted that when it granted Appellant's August 2015 motion to continue the trial to 2016, his counsel had said that Word would get involved in the case because of Gardner's health issues and had assured the court that Word would be prepared to try the case if

12

Gardner was unable to do so. The court found that Word and Thompson as well as Gardner had "the trust and confidence of [Appellant] and any combination of these attorneys would be proper and appropriate." The court therefore concluded that, "after considering and balancing all the factors concerning the timely trial of this case," the trial would proceed as planned in February.

The trial then began as scheduled on February 1, 2016, with Appellant represented by Thompson, Word, and Burton Baker, another experienced capital defender who entered his appearance on that day. Word again objected to proceeding without Gardner, asserting that Gardner remained Appellant's lead counsel with both Word and Thompson as second chairs and Baker as third chair. The trial court noted the objection but allowed the trial to proceed. The record shows that Thompson handled most of the guilt-innocence phase of trial, while Word handled most of the sentencing phase.

(b) The Supreme Court of the United States has held that "the Sixth Amendment secures the right to the assistance of counsel, by appointment if necessary, in a trial for any serious crime." Wheat v. United States, 486 U. S. 153, 158 (108 SCt 1692, 100 LE2d 140) (1988). That Court has also recognized, however, that

13

the purpose of providing [appointed] assistance of counsel "is simply to ensure that criminal defendants receive a fair trial," and that in evaluating Sixth Amendment claims, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.

Id. at 159 (citations omitted). See also Caplin & Drysdale, Chartered v. United States, 491 U. S. 617, 624 (109 SCt 2646, 105 LE2d 528) (1989) ("The [Sixth] Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts.").

Our Court has accordingly held that "[a]n indigent defendant has no right to compel the trial court to appoint an attorney of his own choosing," and thus "[t]he choice of appointed counsel is a matter governed by the trial court's sound exercise of discretion." Davis v. State, 261 Ga. 221, 222 (403 SE2d 800) (1991). That discretion may be abused, we have said, when an indigent defendant's choice of counsel is supported by objective considerations, there are

14

no countervailing considerations of comparable weight, and yet the court denies the defendant's request to appoint or retain the counsel he prefers. See id. See also Grant v. State, 278 Ga. 817, 817 (607 SE2d 586) (2005).

As Appellant contends, Gardner's familiarity with his complex death penalty case, along with his longstanding and positive relationship with Gardner, were objective considerations that supported his request for another continuance so that Gardner could remain his counsel during his trial; neither Thompson nor Word was as familiar with the case. See Grant, 278 Ga. at 818 (recognizing the "strong interest of the defendant and of the court system in sustaining an existing, close relationship between a death penalty defendant and his counsel," where counsel were "'already familiar with the case, which [was] both legally and factually complex'" (citation omitted)); Davis, 261 Ga. at 222 (stating that counsel's familiarity with a legally and factually complex case and their longstanding relationship with the defendant were "weighty considerations" favoring the appointment of those lawyers). But see Morris v. Slappy, 461 U. S. 1, 14 (103 SCt 1610, 75 LE2d 610) (1983) ("[W]e reject the claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel."). Counterbalancing these considerations, however,

15

were objective considerations of at least comparable weight.

To begin with, in full accord with the Sixth Amendment's "essential aim" of guaranteeing an effective advocate for each criminal defendant, Wheat, 486 U. S. at 159, Appellant was represented at trial by three well-qualified and competent capital defenders, and he indicated at the January hearing that he had good relationships with Thompson and Word. All three lawyers were selected to represent Appellant by the capital defender division, not the trial court. One of them (Thompson) had worked on Appellant's case for over a year. Another (Word) was the director of the capital defender division, had practiced law for over 40 years, and had served as lead counsel in many death penalty cases. The third (Baker), who played a smaller role at trial, had served as lead counsel in over 30 death penalty cases. Although Appellant told the trial court that he wanted Gardner to be his lead counsel, he offered no specific reason for that preference, and he did not indicate concern about his relationship with any of his lawyers; the trial court specifically found that Thompson and Word, like Gardner, had Appellant's trust and confidence.

Moreover, these lawyers were prepared to try Appellant's case. In obtaining a continuance of more than five months in August 2015 — at a time

16

when Gardner was on medical leave with no indication if or when he would return to the defense team — Thompson had assured the trial court that the defense team, with Word selecting a lawyer (himself) to replace Gardner, would be prepared for trial by January 2016. At the January 2016 motions hearing, Word again promised the court that the defense team would be ready to go to trial in February. No member of the defense team — including Gardner in his December 2015 conflict notice — told the court that Appellant lacked counsel who were competent and prepared to try his case. And Appellant, who has new counsel on appeal, has raised no claim of ineffective assistance by his trial lawyers, who managed to convince the jury to spare him the death penalty for the premeditated, financially motivated, and brutal murder of his father — whom he had previously rendered paraplegic — and the additional murder of his great-aunt.

The trial court also had a significant interest in bringing Appellant's case to trial without further delay. See United States v. Gonzalez-Lopez, 548 U. S. 140, 152 (126 SCt 2557, 165 LE2d 409) (2006) ("We have recognized a trial court's wide latitude in balancing the right to [retained] counsel of choice . . . against the demands of its calendar." (citations omitted)); Morris, 461 U. S. at

17

11-12 ("[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." (citation omitted)); Phan v. State, 290 Ga. 588, 597 (723 SE2d 876) (2012) (noting that moving the defendant's case forward expeditiously is a "countervailing consideration" to his choice of counsel). See also Cox v. State, 279 Ga. 223, 226 (610 SE2d 521) (2005) ("The right to be represented by a particular attorney is not absolute when it would unduly delay and require the adjournment of a trial because of counsel's illness." (citation and punctuation omitted)). In December 2014, the court specially set Appellant's trial more than seven months in advance; in June 2015, the court denied Appellant's request to continue that trial date to accommodate Gardner's schedule, but the court then granted a continuance of another five months, which Appellant requested just ten days before trial with the express assurance that the defense team would be prepared for trial by the start of 2016 — with or without Gardner. By January 2016, Appellant's case had been pending for more than three years and eight months, and the trial court could reasonably require that Appellant proceed to trial with his team of qualified and competent counsel

18

rather than awaiting whatever further claims for delay might arise.

Thus, this case is considerably different from those in which the trial court sought to impose an entirely new set of attorneys on a capital defendant in place of counsel with whom the defendant had a longstanding relationship and who had deep familiarity with the defendant's case, often from trying the case previously, and in which there was no issue of delay presented. Compare Grant, 278 Ga. at 818 (reversing where the trial court replaced all three of the capital defendant's well-qualified attorneys, who had good relationships with him, because the court "wished to ensure the participation of local counsel"); Davis, 261 Ga. at 221-222 (reversing where, before the mentally "fragile" defendant's third death penalty sentencing proceeding, the trial court replaced his two longtime and experienced counsel, who were available and willing to serve, with a new attorney); Amadeo v. State, 259 Ga. 469, 469-470 (384 SE2d 181) (1989) (reversing where, before the retrial of the defendant's death penalty case, the trial court replaced the two lawyers who had represented him for ten and four years with two local lawyers who had no death penalty trial experience). Under the circumstances of this case, we see no abuse of discretion in the trial court's denial of Appellant's request for another continuance of his trial and no

19

violation of Appellant's Sixth Amendment right to counsel.  See <u>Davenport v. State</u>, 283 Ga. 29, 32 (656 SE2d 514) (2008).

<u>Judgment affirmed in part and vacated in part.  Hines, C. J., Melton, P. J., Benham, Hunstein, Blackwell, Boggs, and Peterson, JJ., concur.</u>

Decided August 20, 2018.

Murder. Newton Superior Court. Before Judge Benton.

Teri L. Doepke; Joseph Blum, for appellant.

Layla H. Zon, District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General, for appellee.