**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: February 3, 2026

S25A1115.  KERNS v. THE STATE.

COLVIN, Justice.

Appellant Jamal Kerns was convicted of the malice murder of his cousin, Keschon Kerns, the subsequent aggravated assault of Malik Golar, and other crimes related to both incidents.[1] On appeal,

---

[1] The crimes occurred on May 20, 2017, and June 6, 2017. On August 31, 2017, a DeKalb County grand jury returned an indictment charging Appellant with malice murder (Count 1), felony murder (Count 2), aggravated assault against Keschon Kerns (Count 3), possession of a firearm during the commission of a felony (Count 4), aggravated assault against Golar (Count 5), and possession of a firearm during the commission of a felony (Count 6). Following a jury trial from November 29 to December 3, 2021, the jury found Appellant guilty of all charges. For the crimes against Keschon, the trial court sentenced Appellant to life in prison with the possibility of parole for malice murder (Count 1) and imposed a consecutive term of five years in prison for possession of a firearm during the commission of a felony (Count 4). Appellant's felony murder charge (Count 2) was vacated by operation of law, and the trial court merged Appellant's aggravated assault charge (Count 3) into Appellant's conviction for malice murder (Count 1). As to the crimes against Golar (Counts 5-6), the trial court imposed a consecutive term of twenty years in prison for aggravated assault (Count 5) and a suspended term of five years in prison for possession of a firearm during the commission of a felony (Count 6).

Appellant timely filed a motion for a new trial through new counsel on

he asserts that the trial court erred by violating his right to be present at trial, in violation of the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section I, Paragraph XII of the Georgia Constitution; that it abused its discretion when it denied his motion for the appointment of new counsel without holding a hearing, in violation of the Sixth Amendment; that it plainly erred by failing to issue a curative instruction regarding Appellant's removal from the courtroom for his disruptive behavior; and that the accumulation of the court's errors unfairly prejudiced Appellant's defense, even if no single error sufficiently did so. For the reasons explained below, we affirm.

1. The evidence admitted at trial showed the following. At the time of the crimes, Appellant lived in DeKalb County with his grandfather, his twin brother, and his cousin, Keschon. Appellant shot and killed Keschon at their shared home. Less than two weeks

January 3, 2022. Appellant did not amend his motion, and he waived his right to a hearing. The court denied the motion for a new trial on October 18, 2024. Appellant timely filed a notice of appeal directed to this Court. The case was docketed to this Court's August 2025 term and submitted for a decision on the briefs.

later, Appellant shot Malik Golar, who was once a close friend of his. Following the shooting of Golar, Appellant was questioned by police and admitted to both shootings.

2. Appellant argues that the trial court denied his right to be present by failing to afford him an opportunity to observe the trial virtually after he was forcibly removed. This claim fails.[2]

(a) The trial against Appellant was set to begin on September 9, 2021. However, in a pre-trial proceeding, Appellant's trial counsel told the court that Appellant wanted the opportunity to be heard outside of the State's presence. The court agreed, and after the prosecutor exited the courtroom, Appellant said, "I wanted my lawyer to let you know that I was out of communication — that I would like to be represented … by someone else." The court noted that Appellant's trial counsel had the case for nearly two years and acknowledged that it "hear[d]" Appellant's complaint of a

---

[2] Because Appellant makes no specific argument that the United States Constitution and Georgia Constitution apply differently to his right-to-be-present claim, we analyze those claims together. See *Tavarez v. State*, 319 Ga. 480, 487 n.8 (2024).

3

"communication problem," but the jury was coming in "twenty-two minutes to try this case," so his trial counsel would "continue to represent him." Appellant then insisted that his counsel was not ready for trial, but trial counsel confirmed that he was. The court concluded that the case would proceed.

The prosecutor then returned to the courtroom, and as the proceedings went on, Appellant interrupted the trial judge several times. In the presence of the State, Appellant renewed his request for a new attorney through counsel. Counsel stated that Appellant "would like the [c]ourt to know that he would like another attorney, and ... another [j]udge." The trial court told Appellant that his counsel "is an excellent attorney," that Appellant could not "find a better attorney to represent [him]," and that his trial counsel had been practicing "for over 20 years." The court further stated that counsel was "well prepared in this matter," and it confirmed that counsel had participated in more than 100 trials in his career. The court concluded by stating that the trial would proceed "with me being the [j]udge ... [and with counsel] representing [Appellant]."

4

Appellant responded by stating that he "fear[ed] that [his] attorney is not as confident to represent [him] as he is other people[.]"The court noted Appellant's concerns but stated that it was "denying any request that [Appellant] ha[d] for another attorney or for this proceeding to be delayed."

The court attempted to move the proceedings forward, but Appellant refused to sign his indictment. The court stated that it "appear[ed]" that Appellant was "malingering" to "stall[ ]" the proceeding. As the court tried to remind Appellant of the proper behavior in the courtroom, Appellant interrupted and said that he had "talked last night [with his trial counsel.] [Trial counsel] said that he wasn't confident in [his] case." As the court attempted to explain that Appellant's conversations with his attorney were privileged, Appellant again insisted that "[he was] being represented by ... someone that isn't confident of [his] case." Appellant's trial counsel then explained:

> I expressed to [Appellant] my concerns … with this case going to trial. And that's my job to offer my opinion on the value of [Appellant's] case. And [Appellant] and I differ on

that issue, and I'll leave it at that. But as to confidence in this case ... I've tried many murder cases. I don't think this one is going to be a problem.

After resolving a few pre-trial matters, the court noted that "it would not be appropriate" for Appellant to ask questions in the presence of the jury, and asked trial counsel if he wanted to "have a conversation with [his] client." Trial counsel agreed, and the court recessed.

When it resumed, trial counsel reported that, due to Appellant's "disappoint[ment]" with him, Appellant was requesting that "the court allow him to represent himself[.]" The court then conducted a *Faretta*[3] hearing. During the hearing, Appellant gave several non-responsive answers and twice asked the court if anyone was "hearing voices." Based on Appellant's answers, the trial court denied Appellant's request to represent himself. It also denied Appellant's request to replace trial counsel, stating that it would not "release" trial counsel from representing Appellant. Lastly, the court granted a joint request for a continuance so that Appellant's

---

[3] See *Faretta v. California,* 422 US 806, 819 (1975).

6

competency for trial could be assessed again.[4]

After Appellant was again declared competent to stand trial, his trial began on November 29, 2021. Before voir dire, Appellant's trial counsel again asked if Appellant could address the court. After being sworn in, Appellant asked for a change of venue and requested that his trial counsel be "excused altogether because it's a conflict of interest." He also reminded the court that he had "discuss[ed] the problem that [he] was having with [trial counsel]. The court denied his request and told Appellant that if he became disruptive, the court would have him removed and that the trial would resume "with [him] being in the holding cell or somewhere secure so he [could] watch the proceedings virtually." Appellant claimed that he could not understand and asked for an opportunity to speak. The court granted Appellant "two minutes." Appellant then listed several code sections that appeared to have no relevance to his

---

[4] At the time of this ruling, Appellant had already been evaluated and declared competent to stand trial. However, trial counsel indicated that he was concerned about the length of time since his last evaluation, and the State and trial counsel agreed that Appellant should be evaluated again.

motion for new counsel[5] and again insisted that he could not be represented by his current counsel. Appellant did not raise any other specific issues with his trial counsel.

After Appellant confirmed that he did not have anything else to add, the court again told Appellant that it had denied his request for new counsel. But as the court attempted to proceed, Appellant continued to lodge vague complaints about trial counsel, insisting that Appellant "c[ould not] have him as his attorney." At one point, Appellant asked if he could be excused because he was "not about to sit here and, one, out of [his] character because what's being said out of [his] mouth is more powerful than the case itself." When the court indicated that Appellant could leave, Appellant insisted that the "case doesn't make any sense with the person being out of the courtroom." At that point, the court asked counsel to move his chair so that the jury could not hear Appellant's interruptions. The court then announced that the jury was about to come in and warned

_____

[5] Appellant cited OCGA §§ 16-5-90, 17-7-150, 24-4-406, which relate to stalking, evidence of habit and routine and practice, and changes of venue, respectively.

8

Appellant that if he continued to speak audibly in the jurors' presence, the court would "have him removed."

Despite this warning, Appellant continued to interrupt the proceedings. The court gave Appellant a final warning to "remember the instructions," and the jury entered the courtroom. The record then reflects that Appellant began to speak to the jurors "indiscernibly" during their initial examination. The court stopped the proceedings and then asked the jurors to leave. As they exited, Appellant told the jury that he had "paranoid schizophrenia" and that was "why a jury shouldn't be called in here."

After the jury exited, the court told Appellant:

> From the moment … the jurors were seated and up to present, you have constantly been making comments in which all of the jurors … have been able to hear you. The [c]ourt has been able to hear you. And … your tone has become increasingly louder for people to hear what you are saying. I instructed you that if you had anything that you wanted to say to the court or to your counsel, you need to talk to your counsel. And during this time, you have been deliberately … asking questions of cocounsel or making statements to cocounsel and to [trial counsel] in a manner that is not private, and which we could hear. As I sent the jurors out for a brief recess, you started making comments to the jurors so they could hear you. So, at this

time, the [c]ourt finds that your conduct and behavior is unacceptable, it's disruptive to this process and as such, I'm going to have you removed for the remainder of the trial.

The court then said that it would "try" to see if it could "set up … something before opening statements and evidence" where Appellant could "see the process virtually," but noted that it would "take … some time" and that, therefore, "for jury selection, we're going to proceed … without [Appellant]." The State inquired if the court could do "periodic checks" with Appellant to determine if Appellant wanted to return to the courtroom. Appellant's trial counsel agreed and added he would like to be allowed to an opportunity to speak with Appellant briefly before the court returned from the lunch break "to see if he's in a better position to participate." He also stated that it would "probably be prudent … to see what would be possible to set up in the event that [Appellant] is not able to be physically present with us." Counsel suggested the parties "get that going" by "openings tomorrow."

Trial counsel went out to speak with Appellant's social worker

and when trial counsel returned, voir dire began. The record does not reflect that any party insisted on any assurance that Appellant could see or hear the proceedings virtually as they moved forward.

Following a recess from voir dire and outside of the presence of the jury, trial counsel said that, in line with the court's instructions, he had attempted to speak with Appellant, but that Appellant refused to come to the "attorney booths" so that trial counsel could speak with him. Though the court then indicated that Appellant should be brought up, the record does not reflect that Appellant was returned to the courtroom.

On the second day of trial, the court stated that, on the first day of trial, it had twice asked Appellant, through the courtroom deputies, if he wanted to participate in the process and that the court was "informed" that Appellant refused to "participate in the process" in the courtroom. Neither party objected to this description.

That morning, a deputy informed the court that Appellant said that "he's not coming out." The court stated, after its inquiries and Appellant's refusal on the prior day, that it was "inclined to see if we

11

can set up monitors … for [Appellant] to watch the trial proceeding virtually in the holding cell where he is now." Appellant's trial counsel agreed, stating that he would "definitely … prefer … to give him the opportunity to view the trial." The court then stated that it would "reach out to IT and see if they can set that up."

Trial counsel then asked the court to tell Appellant that counsel was withdrawing Appellant's insanity plea. To do so, the trial judge entered Appellant's holding cell with the court reporter present. There, the trial judge said, "[I]t's my understanding that you do not want to come in the courtroom and participate in your trial[.]"Appellant confirmed that he "would rather not participate[.]"Appellant again complained about his trial counsel, insisting that he "want[ed] to represent [himself]" and that he did not want to talk to his trial counsel. After the court reminded Appellant that it had ruled on these requests, it gave Appellant two options: Appellant could return to the courtroom or remain in the holding cell where the court would "set up a Zoom link" to watch the proceedings. Appellant did not answer and instead insisted that his

12

attorney was a "danger" to him and that he had a "constitutional right to have someone else represent him." The court concluded that Appellant was being unresponsive and stated that it would "set up the cameras" for Appellant to watch the trial from the holding cell.

Following opening statements and a recess for lunch, a deputy alerted the court that Appellant refused to come to the holding cell after leaving it to eat lunch. Later, the deputy who interacted with Appellant testified that when he "tried to talk to [Appellant]" about coming to see the proceedings, Appellant mentioned that "they had a TV in the back waiting for him, so he could see what's going on." The deputy responded that he "d[idn't] know." Appellant then stated that he "wanted to stay downstairs" and refused to come up.

On the morning of the third day of trial, a courtroom deputy testified that Appellant was again refusing to come upstairs. According to the deputy, Appellant said that he had "no reason to get dressed to come upstairs" and insisted that trial counsel "should be fired." The deputy asked Appellant if he was "refusing to get dressed to go upstairs[.]" Appellant responded, "Yes." The court then

asked the deputy if it was possible for the deputy to communicate that "the only way that [Appellant] will be able to see the proceedings virtually is if he comes up in the holding cell because … I cannot safely have [the technology] brought downstairs. But he would need to appear upstairs in a holding cell." The deputy agreed.

At lunch on the third day, Appellant gave a note to the court asking for a mistrial to be declared "for the reason and factors that he presented earlier to the [c]ourt when we were in the holding cell," which were his discontent with trial counsel and his request to represent himself. The note also stated that he would return to the court "if that attorney is not there" and "if he could[ ] represent himself." The court did not rule on Appellant's request for a mistrial. After there was some discussion on how to allow a witness to do an identification of Appellant in his absence, the proceedings continued with the examination of two witnesses. At the end of the day, the court notified Appellant's trial counsel that it intended to inquire the next morning about whether Appellant sought to testify and that it would do so virtually.

14

On the morning of the fourth day of trial, Appellant appeared virtually from the jail courtroom. Appellant's counsel attended court in person. Outside of the presence of the jury, the court stated that Appellant was not physically in the courtroom because he was "disruptive and … was refusing to appear[.]" There was no objection to this description of Appellant's prior and continued removal from the courtroom.

The court then asked Appellant to "come to the podium" of the jail courtroom to determine if he wanted to testify. When Appellant did not do so, the court asked that the record reflect that Appellant was virtually present but "refusing to stand and come to the podium." The court then ruled that Appellant was refusing to participate.

During a recess on the fourth day, the court inquired if Appellant would like to testify. After that inquiry,[6] the court asked

---

[6] Due to the vague nature of Appellant's responses to the court's inquiry about his desire to testify, the court later inquired again about whether Appellant wanted to testify, and at that point, Appellant unequivocally confirmed that he did not want to testify. **«V11-553-4»**

15

Appellant if he would like to be "physically present in the courtroom, tomorrow morning" or "remain in the jail courtroom" where he currently was. Appellant responded, "No, [he] would not like to go in the courtroom."

Later, during a charge conference where Appellant was virtually present, the court asked again if Appellant wanted to be "physically present" in the courtroom the next day. Appellant responded, "No." The court then asked Appellant if he would like to watch the trial virtually from the holding cell. Appellant answered, "No."

On the morning of the fifth and final day of trial, a deputy informed the court that Appellant was present but again refused to come to the courtroom. The deputy who interacted with Appellant testified that when he went downstairs to retrieve Appellant, he asked if Appellant was ready to go and Appellant responded, "No." The court again stated that Appellant had been removed based on his "behavior," and that it would proceed forward.

After the examination of the remaining witnesses and closing

arguments, the jury found Appellant guilty of all charges. When the court resumed for sentencing, the deputy who interacted with Appellant testified that Appellant again refused to be brought to the courtroom. The court, without any prompting from the parties, had IT set up a Zoom link so Appellant could see and hear the sentencing from the holding cell.

(b) Appellant advances two arguments in support of his right-to-be-present claim. First, Appellant contends that his removal was only authorized if he engaged in "misconduct," and that his disruptive behavior did not amount to misconduct because he was insisting on a hearing to which he believed he was entitled. Second, Appellant argues that even if there was sufficient cause to remove him from the courtroom, the court abused its discretion by failing to take measures available to it to ensure Appellant could see and hear the trial virtually after he was removed. Appellant contends that though he may have waived his right to be physically present through his behavior, he did not waive his virtual presence, and that his waiver of his physical presence "was at least in part predicated

17

on the fact that" a means of viewing the proceedings virtually would be made available to him. We review each of these claims in turn.

"[A] criminal defendant's right to be present at all critical stages of the proceedings against him is a fundamental right and a foundational aspect of due process of law." *Hampton v. State,* 282 Ga. 490, 491–92 (2007) (citing *Tennessee v. Lane,* 541 US 509, 523 (2004)). But a defendant can "lose" his right to be present at trial where "he has been warned by the judge that he will be removed if he continues his disruptive behavior, and he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Weaver v. State,* 288 Ga. 540, 542–43 (2011) (citing *Illinois v. Allen,* 397 US 337, 343 (1970)). "Once lost," the right to be present can be reclaimed "as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." Id.

The court's determination in the removal of a disruptive defendant is reviewed for abuse of discretion. See *Allen,* 397 US at

343–347 (holding that trial judges confronted with "disruptive" defendants must be given "sufficient discretion to meet the circumstances of each case" and concluding that there was "nothing" in the record showing that the "trial judge did not act completely within his discretion"). See *United States v. Nathaniel Hilliard*, 2026 WL 73977, slip op. at 20 (11th Cir. Jan. 9, 2026) (holding that the district court "did not abuse its discretion" in its handling of a disruptive defendant). See also *Weldon v. State*, 247 Ga. App. 17, 19 (2000) (stating that, where "circumstances may arise which necessitate action by the trial judge to control an obstreperous or disruptive defendant," the "test on appeal" is "[a]buse of discretion").

(i) Although Appellant concedes that "there [was] sufficient evidence to support the court's conclusion that [he] was disruptive," Appellant asserts that his behavior was focused on the insistence upon a hearing to determine whether there was a communication breakdown with his attorney, and that his behavior therefore was not misconduct. Relying on *State v. Fletcher*, 252 Ga. 498 (1984), Appellant argues that trial courts are authorized to remove a

19

defendant only if he demonstrates some "misconduct."

This is a misstatement of *Fletcher*. There, a defendant was removed from the court without warning after demonstrating violent and disruptive behavior. *Fletcher*, 252 Ga. at 498. We held that, under the circumstances, the defendant could be removed without a warning, but that where a defendant is removed without an initial warning and is subsequently brought before the court and evidences no violent or disruptive behavior, *Allen* requires that the court make inquiry as to the state of mind of the defendant or warn him of the consequences of misconduct and inform him that by proper conduct, he could regain the right to be present. 252 Ga. at 500–01. To the extent that there is a difference between disruptive behavior and misconduct, *Fletcher* did not make that distinction but expressly applied the standard in *Allen*. 252 Ga. at 501.

Moreover, we have made clear that "[a] defendant's right to counsel may not 'be insisted upon in a manner that will obstruct an orderly procedure in courts of justice[ ] and deprive such courts of the exercise of their inherent powers to control the same.'" *Lynd v.*

*State*, 262 Ga. 58, 62 (1992) (quoting *United States v. Burton*, 584 F2d 485, 489 (D.C. Cir. 1978)). Here, Appellant was warned by the court that he would be removed if he continued to disrupt the proceedings, and he nevertheless continued to act in a disruptive manner. See *Allen, supra,* 397 US at 343 (emphasizing that a disruptive defendant can lose his right to be present after a "warn[ing]" from a judge about his behavior). Therefore, the court did not abuse its discretion in removing Appellant from the courtroom. See *Weaver v. State*, 288 Ga. at 540–43 (holding that the trial court did not abuse its discretion in removing from the trial a defendant who had, among other things, "yelled and screamed incoherently numerous times" during voir dire).

(ii) Second, Appellant argues that his waiver of his right to be physically present was conditioned, at least in part, on the court's representation that he would be able to view his trial virtually and that the trial court abused its discretion by failing to ensure Appellant had such a capability after he was removed.

As an initial matter, a full review of the record makes it clear

that Appellant was removed for his disruptive conduct, rather than being removed on the condition that he be allowed to see or hear the trial virtually. Although the court stated at different portions of the proceedings that it would "try" to set up a virtual way to see the proceedings and, in one instance, stated that it planned to do so, Appellant's trial counsel never followed up on this statement but instead continued participating in the proceedings without any additional assurance that Appellant would be able to see and hear the proceedings. Nor did Appellant, despite frequent check-ins, ever insist on a way to see or hear the trial virtually. While he once "mentioned" that the court may have had a "TV" for him to view the proceedings, when Appellant was asked by the court on the following day if he would like to watch the trial virtually, he said, "No." Therefore, the record shows that Appellant never attempted to reclaim his right to be present. See *Weaver*, 288 Ga. at 540–43 (holding that the defendant's right to be present was not violated where defense counsel repeatedly visited the removed defendant and informed the court that he did not want to return, and the court

22

had "firsthand knowledge of how difficult" the defendant could be). Cf. *Fletcher*, 252 Ga. at 499–501 (affirming reversal of defendant's conviction where the disruptive defendant was given no initial warning prior to his removal and, when later brought before the court, evidenced no disruptive behavior).

Appellant's argument that the trial court violated Appellant's right to be present by failing to let him see or hear the proceedings virtually also fails. While we have held that the right to be present certainly encompasses a right to see and hear the proceedings,[7] our precedent does not support a separate right to do so virtually after a disruptive defendant has been physically removed from the courtroom. Though Appellant cites some cases that discuss virtual proceedings, they do not require such accommodations. See *Dukes v. State*, 361 Ga. App. 4, 7 (2021) (holding that the defendant, who was kept in a holding cell "equipped with audio such that he could hear

---

[7] See *Champs v. State,* 310 Ga. 832, 839 (2021) ("This Court has long held that the Georgia Constitution guarantees criminal defendants the right to be present, and see and hear, all the proceedings which are had against him on his trial before the court.") (cleaned up).

the proceedings" at the courthouse, voluntarily waived his right to be present during his trial where he repeatedly announced that he "did not want to sit with counsel in the courtroom and elected to sit in a holding cell"). See also *Illinois v. Allen*, 397 US 337, 351 (1970) (Brennan, J., concurring) (stating that when a defendant is excluded from trial, the court "should" make reasonable efforts for him to communicate with his attorney and noting that it is "not weakness to mitigate the disadvantages of his expulsion as far as technologically possible in the circumstances").

3. Appellant further argues that the trial court erred in failing to conduct a hearing before his request for new counsel was denied and "based on a demonstrable breakdown in communication, failed to replace [trial] counsel at [Appellant's] insistence." These claims fail.

(a) As to Appellant's first contention, this Court has never held that a hearing is required before a court denies a defendant's motion to replace his counsel. Nor has Appellant cited any binding cases

supporting such a rule.[8] But even if we assume that Appellant was entitled to a hearing, Appellant's claim still fails because the court did, in fact, hear Appellant's concerns regarding his counsel.

The court first granted Appellant an opportunity to address the court about his concerns with his trial counsel on his first trial date. At that time, Appellant claimed he was "out of communication" with his attorney. Although Appellant points to this statement as evidence of a breakdown of communication between Appellant and trial counsel, the record shows that Appellant said during the

---

[8] On appeal, Appellant relies heavily on a non-binding decision from the Ninth Circuit, *Nguyen*, which requires trial courts in its Circuit to conduct a "sufficient inquiry" into a defendant's request for a substitution of counsel. *United States v. Nguyen*, 262 F3d 998, 1004 (9th Cir. 2001). *Nguyen* is factually distinct from this case. There, a private defense attorney informed the judge that the defendant had attempted to retain him to replace his public defender, that he had just learned that the trial was set for that day, and therefore, his firm could not take the case. Id. at 999. The trial judge pointed out that it was "the eve of trial" and concluded that the court would not "delay the trial." Id. at 1000. The trial judge therefore stated that the defendant's current counsel would remain in the case, and the private defense attorney could come in as "associate counsel." Id. at 1000. The private defense attorney then stated that he would not represent the defendant. Id. During the trial that afternoon, the defendant complained that the public defender representing him was "rude to him" and almost "never sat down and talked to him about his case." Id. The defense attorney also acknowledged that his client "just [would not] talk to [him] anymore." Id. at 1004. None of this occurred here. Without adopting the reasoning of *Nguyen*, we conclude that it is distinguishable for these reasons.

25

hearing that he had talked to trial counsel the night before. And Appellant's trial counsel was also given a chance to speak and explained that the disagreement between the two was over trial counsel's opinion on the "*value*" of the case — that is, the wisdom of going to trial on Appellant's case — rather than trial counsel's confidence in his preparation for trial.

Although the court denied Appellant's request for new trial counsel at that time, it gave Appellant a second opportunity to address the court at the start of his second trial date. After Appellant was duly sworn, he only indicated vague complaints about his counsel. And, again, the court denied his request to replace his trial counsel after hearing those complaints.

Therefore, the court heard Appellant's concerns and both trial counsel and Appellant — the only available witnesses to the alleged communication — were given an opportunity to speak about the issue. Thus, Appellant's claim that his request for new counsel was not heard fails.

(b) Appellant also argues that the trial court erred in denying

26

Appellant's motion to replace counsel. This claim also fails.

"[A]n indigent defendant has no right to compel the trial court to appoint an attorney of his own choosing," and thus the "choice of appointed counsel is a matter governed by the trial court's sound exercise of discretion." *McCullough v. State*, 304 Ga. 290, 296 (2018) (citation omitted). That discretion may be abused "when an indigent defendant's choice of counsel is supported by objective considerations, there are no countervailing considerations of comparable weight, and yet the court denies the defendant's request to appoint or retain the counsel he prefers." Id. at 296–97.

Appellant argues that a "demonstrable breakdown in communication" with his trial counsel occurred because Appellant and his trial counsel were "not communicating at all prior to and then throughout the trial." Indeed, we have held that a "complete breakdown in communication" between counsel and his client may support counsel's discharge. See *Bryant v. State*, 268 Ga. 616, 617 n.4 (1997) ("[The defendant] failed to support the discharge of counsel by setting forth any justifiable dissatisfaction with counsel,

27

such as conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between counsel and client." (citation omitted)).

Here, however, the record does not support Appellant's argument that he and his trial counsel "were not communicating at all prior to and then throughout the trial." At the time Appellant complained that he was "out of communication" with his attorney, Appellant also said that he had talked to counsel "last night." Therefore, any communication breakdown appears to have only occurred after Appellant's first motion had been denied.

Although there were several incidents where Appellant unilaterally refused to speak or interact with his trial counsel during the course of his subsequent trial, the record shows that Appellant's trial counsel demonstrated a continued willingness to speak with Appellant. Trial counsel told the trial judge that Appellant wanted an opportunity to address the court; he told the court about several of Appellant's concerns on the morning of his second set trial date; he attempted to speak with Appellant at the court's request; he

ensured that Appellant was informed of the withdrawal of Appellant's insanity plea; and trial counsel had at least one "brief" meeting with Appellant. Therefore, the record does not show that Appellant and his attorney "were not communicating at all prior to and then throughout the trial," and the court did not abuse its discretion in denying Appellant's request to replace his counsel on the basis of a "demonstrable breakdown in communication."

4. Appellant also argues that the trial court erred by failing to instruct the jury regarding his absence from the courtroom. Appellant did not request any instruction regarding his absence, and so we review this claim for plain error only. *Walton v. State*, 920 SE2d 116, 128 (Ga. 2025).

> To establish plain error, a defendant must show that an error occurred, was not affirmatively waived, was clear and obvious beyond reasonable dispute, and affected his substantial rights. If that showing is made, then we consider whether the error seriously affected the fairness, integrity, or public reputation of judicial proceedings.

*Profet v. State*, 922 SE2d 33, 41 (Ga. 2025) (cleaned up). And if Appellant "fails to show just one of these elements, we need not

analyze the rest." *Richardson v. State,* 318 Ga. 690, 695 (2024).

Here, Appellant's plain error claim fails because he has not identified a legal error that is "clear or obvious under current law." *Davis v. State,* 312 Ga. 870, 874 (2021) (citation omitted) ("An error cannot be plain where there is no controlling authority on point."). Though Appellant cites Georgia Court of Appeals cases where courts gave an instruction concerning a defendant's absence from the courtroom, see, e.g., *Sanders v. State,* 242 Ga. App. 487, 490 (2000), none of these cases require such an instruction. Furthermore, Appellant has failed to identify any controlling precedent that requires such an instruction, and we have found none. Therefore, this enumeration fails. See *Simmons v. State,* 299 Ga. 370, 375 (2016) (denying that the defendant's claim under the plain error standard of review failed where there was "the absence of clear authority" on the issue); *Hill v. State,* 321 Ga. 177, 184 (2025) (same).

5. Finally, Appellant argues that the cumulative effect of the court's errors unfairly prejudiced Appellant's defense, even if no

single error sufficiently did so. This claim also fails.

In considering a claim of cumulative error, we "evaluate only the effects of matters determined to be error, not the cumulative effect of non-errors." *O'Neal v. State*, 316 Ga. 264, 271 (2023). As explained above, Appellant has failed to show that the trial court erred in any regard. Accordingly, "there are no errors to aggregate, and his claim of cumulative error also fails." Id.

*Judgment affirmed. All the Justices concur.*